[No. 27683. Department One. November 15, 1939.]

C. R. WOOD et al., Respondents, v. WASHINGTON NAVIGATION COMPANY, Appellant.[1]

[1]Reported in 95 P. (2d) 1019.

*Peterson, Jackson & Hale,* for appellant.

*Ray R. Greenwood* and *Henderson, Carnahan & Thompson,* for respondents.

Robinson, J.—This is an appeal from a judgment for plaintiffs entered in a personal injury action, tried to the court without a jury.

It was alleged in the complaint that the plaintiffs, after paying the regular fare for transportation to Point Defiance, drove their automobile on board the defendant's ferry boat at Gig Harbor about seven o'clock on Christmas morning, 1938; that Mrs. Wood decided to go to the upper deck; that, while walking from the automobile to the door at the foot of the gangway, she fell and was severely injured, and:

"That the fall so experienced by the said Jessica Wood at said time and place was due solely and directly to the negligence and carelessness of the defendant in this, that it had permitted the surface of said deck immediately in the approach to said doorway over which the said Jessica Wood was obliged to pass, to be and become in a wet, frosty, icy and slippery condition, of which she had no knowledge, but of which the defendant had knowledge or could and should have had, by a reasonable inspection of said deck."

Defendant filed a general denial, supported by affirmative defenses of contributory negligence and as-

sumption of risk. At the close of the trial, the court entered findings and conclusions favorable to the plaintiffs and, pursuant thereto, a judgment for $1,218.42.

■ In its brief on appeal, appellant makes the following "statement of questions involved:"

"(1) Should a court (sitting as a trier of the facts) accept as true, testimony of witnesses as to facts which are directly contrary and in opposition to natural laws?

"The trial court answered 'yes.'

"(2) Will water falling or otherwise deposited upon the deck of a ferry boat 52 feet wide, which deck is approximately six inches higher in the center than at the sides to which it slopes from the center for the purpose of shedding water, remain on said deck and freeze so as to form a sheet of ice thereon with the temperature considerably higher than thirty-two degrees fahrenheit at sea level?

"The trial court answered this question 'yes.'

"(3) Is one walking upon the deck of a ferry boat in broad daylight and who admits that while walking thereon she did not look at the surface of said deck and observed nothing unusual or otherwise thereon to account for her fall, and who predicates her right to recovery upon the existence upon said deck of a sheet of ice approximately one yard square, as testified to not by her but by witnesses in her behalf, guilty of contributory negligence?

"The court answered this question 'no.'

"(4) Is testimony tending to show the alteration or repair of an alleged negligent condition after the sustaining of the injury complained of admissible in evidence?

"The court answered this question 'yes.'

"(5) Where injury is sustained by a pedestrian on the deck of a ferry boat, there being no claim that it was caused by the motion of the boat, nor by any factor having to do with the operation of the boat as a carrier, as distinguished from a proper maintenance of a depot, platform, ferry dock, sidewalk, or other stationary surface for pedestrian travel, is the degree

of care devolving upon the operator reasonable care or the highest degree of care compatible with reasonable operation?

"The court in answering this question held that the 'highest degree of care' rule applied."

Subdivision 4 of Rule XVI, Rules of the Supreme Court, 193 Wash. 24-a, covering contents and style of briefs, was enacted in the hope that, upon taking up an appellant's brief, the members of the court would be at once accurately and impartially advised as to the questions presented upon the appeal. Question 1 is not calculated to perform that function. It seems rather to have been framed with the purpose of compelling an answer favorable to the appellant, since it must have been realized that the court would scarcely express the opinion that the operation of natural laws was temporarily suspended in the Gig Harbor region on that particular morning. Purported question 2 is more of an argument than a question, and question 3 is based upon a palpably false assumption of fact.

We take this opportunity to say in passing that, although subd. 4 of Rule XVI has been in effect and on trial but a comparatively short time, we are convinced that, if the members of the bar will make a conscientious attempt to comply with it, it will be of great advantage to all concerned, meaning by "all concerned" the litigants, their counsel, and the court.

■ After reading the evidence in the case, we conclude that everything suggested by questions 1 and 2 may be dealt with by answering the question: Is there sufficient evidence in the record to support the finding that there was ice on the deck at the point where Mrs. Wood fell? Two apparently disinterested witnesses testified quite positively that there was. One of them testified that he had slipped on it himself and was about to call out a warning to Mrs. Wood when she stepped

on it and fell. Mr. Wood testified to the presence of ice, and Mrs. Wood said she saw it after she had fallen. The master of the vessel and two deck hands denied that there was any ice present, and an attempt was made to show that there could not have been.

Fred Myers, in charge of the government weather bureau office at Tacoma, testified that the temperature readings taken on top of the Fidelity building at Tacoma, beginning at six p. m., December 24, 1938, showed hourly temperatures, in degrees fahrenheit above zero, as follows: 45, 46, 46, 45, 44, 43, and 43 midnight, and beginning at one a. m. on December 25th, hourly, 43, 42, 41, 40, 39, 39, and at seven a. m., 38; and further, that the lowest temperature reported at Seattle was 43 degrees for December 24th and 37 degrees for the 25th, and the lowest for Olympia for the 25th, 35.

There was testimony also that the vessel's engines were located under the deck and had been warming up for half an hour before Mrs. Wood fell; and further, that the deck was approximately six inches higher in the middle than at the outer edges, with the result that water poured on it quickly ran off.

A layman might reasonably conclude, from the temperatures given, that there could not have been freezing weather at Gig Harbor on the morning of the accident, even though he knew, or had reason to suspect, that there might be considerable variation in temperature between points only a few miles apart. We note, however, that Mr. Myers, a government weather observer of seventeen years' experience, and the witness who personally furnished the data as to the temperatures in Tacoma, Seattle, and Olympia, was unwilling to sponsor that conclusion. We quote from his testimony, as follows:

"Q. You would not undertake to say what the temperature was on the deck of the 'Skansonia' over at Gig

Harbor on the morning of the 25th? A. We have no records of that at all. Q. *You could not tell whether it was freezing or not?* A. *I would not say it was or was not.* Q. Is it not a fact, Mr. Myers, that it might be apparently comfortable in Seattle, no evidence of any freezing at all, and traveling across the bay to say a place like Bremerton, located eighteen miles away, it would be freezing and icy? A. We have no records of Bremerton, but we have some at Vashon island that would be comparable. Q. That can happen, can it not? A. Vashon island the lowest temperature was twenty degrees on the 13th, and at Tacoma at the same time the lowest temperature was twenty-five." (Italics ours.)

Under the circumstances, we cannot hold that the trial court erred in accepting the testimony of the two plaintiffs and the two disinterested witnesses, all of whom testified positively that they saw ice present on the deck.

Question 3 opens as follows: "Is one walking upon the deck of a ferry boat in broad daylight . . . " If the court were required to do so, it could take judicial notice that, in this latitude, it cannot possibly be "broad daylight" at seven a. m. on December 25th. However, we need not resort to judicial notice. There is testimony in the record which is explicit on the point, testimony given by appellant's own principal witness, the master of the ferry boat. Mrs. Wood fell before the vessel left the dock. The accident was reported to her master, Captain Hunt. After he had gotten his vessel under way, he left his pilot house and went below to investigate the matter, and even at that time, according to his testimony:

"It was not clear daylight; it was not sunrise yet. It was still twilight. We were running with deck lights on and sidelights on. Q. In other words, it was not possible to see very clearly? A. It was not bright daylight, but it was fair."

Mrs. Wood had gotten out of the automobile, intent on going to the upper deck. She saw a smooth stretch of deck in front of her, with no obstacle in her path. She was justified in assuming that it was in a safe condition to walk upon. As testified to by several witnesses, the icy spot was comparatively small, dark in color, and not easy to see. It was not incumbent upon her to keep her gaze fixed upon the deck during every step of her progress. *Watson v. Zimmerman*, 175 Wash. 410, 27 P. (2d) 707. We find no evidence in the record which would have justified the trial court in holding that Mrs. Wood was negligent.

As to question 4, the appellant's position is, perhaps, technically correct. The rule for which it contends is well settled (*Bell v. Washington Cedar Shingle Co.*, 8 Wash. 27, 35 Pac. 405), and the reason underlying it is well stated in *Carter v. Seattle*, 21 Wash. 585, 59 Pac. 500. The standard exception to the rule is discussed in *Erickson v. McNeeley & Co.*, 41 Wash. 509, 84 Pac. 3, and the circumstances here do not bring the matter within the exception.

However, the evidence complained of was merely to the effect that, after Mrs. Wood fell, one of the deck hands took some sand from a box and scattered it on the deck. He afterwards explained that the sand was kept to help cars get traction when going to the slip when there was snow on the ground, and, in accounting for his act, said: "It was something to be doing something to show that we are on our toes on the ferries. That is all, sir."

The master testified that it had never been the custom or practice to use sand or salt or other abrasives on the deck to keep persons from falling.

The trial judge indicated, from a comment made when the evidence was objected to, that he understood that it could not be considered as any sort of an ad-

mission of negligence. Presumably, it did not affect his decision. At all events, it does not influence our decision in reviewing the case *de novo*. The error, if any, is harmless.

█ Finally, it is said that the court decided the case upon the theory that the defendant, as a common carrier, owed the plaintiffs the highest degree of care consistent with practical operation, and this is assigned as error warranting the granting of a new trial. That the trial judge did decide the case upon that theory, is clearly shown by his remarks at the close of the trial. To support the assignment, appellant relies upon the cases of *Norton v. Anderson,* 164 Wash. 55, 2 P. (2d) 266, and *McLain v. Easley,* 150 Wash. 148, 272 Pac. 66. The first of these cases merely holds that ordinary care is the measure of duty with respect to maintaining an approach to a ferry. Here, we are concerned·with the ferry boat itself. Appellant quotes from the second case, as follows:

"The court gave an instruction (No. 9) which casts upon appellants the duty of using the highest degree of care consistent with practical operations, not only as to operations, but also as to equipment, the selecting of its employees and preparing the approaches. In thus including elements other than operations, the instruction seems to go beyond what is recognized as a general rule."

But from a reading of the decision, it appears clear enough that the vice of the instruction consisted in the fact that it cast upon the appellants in that case the duty of using the highest degree of care in selecting its employees and preparing the approaches. That portion of the opinion quoted was never intended to state a rule excusing a common carrier from using the highest degree of care in furnishing a safe conveyance. That is a matter of operation. See the multitude of

332

citations in Washington Digest, Annotated, under "Carriers," Key Number 280 *et seq.*

The judgment appealed from is affirmed.

MAIN, MILLARD, and SIMPSON, JJ., concur.

BLAKE, C. J., concurs in the result.